William T. Collins and Mildred A. Collins v. Commissioner. William T. Collins and Mildred Collins v. Commissioner.
Collins v. Commissioner
Docket Nos. 43962, 49400.
United States Tax Court
T.C. Memo 1956-156; 1956 Tax Ct. Memo LEXIS 138; 15 T.C.M. (CCH) 772; T.C.M. (RIA) 56156; June 29, 1956
*138 Maurice Weinstein, Esq., 623 North Second Street, Milwaukee, Wis., for the petitioners. J. Bruce Donaldson, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings, respondent determined deficiencies in income tax and additions to tax, as follows: Additions to Tax
Calendar
Section
Section
Section
Year
Deficiency
293(b)
294(d)(2)
294(d)(1)(A)
1944
$7,082.99
$3,541.49
$438.97
1945
2,568.25
1,732.96
424.98
$ 968.32
1946
12,506.43
6,291.72
760.41
1,267.36
1947
11,029.40
6,097.03
842.00
1,403.34
1948
1,312.36
656.18
116.93
194.88
1950
2,533.98
1,266.99
152.04
253.40
1951
1,680.98
840.49
133.26
222.08 The deficiencies were determined by the net worth method. The issues raised are: (1) whether petitioners understated their income and, if so, in what amount; (2) whether part of the several deficiencies is due to fraud with intent to evade tax; (3) whether the statute of limitations bars the deficiencies for 1944 through 1948; (4) whether petitioners substantially underestimated their estimated tax for each year; and (5) whether petitioners *139 failed to file declarations of estimated tax for the years beginning with 1945 without reasonable cause. Respondent concedes that there is no deficiency or addition to tax for fraud for 1948 if his determinations of cash on hand are found correct. Findings of Fact Some facts have been stipulated and are found accordingly. Petitioners, who are married and maintain their principal residence in St. Paul, Minnesota, filed timely joint individual returns for the years in issue with the collector of internal revenue for the district of Minnesota. They filed an amended joint individual return for 1944 in 1948. In 1923 Mildred Collins, age 5, moved with her parents from Chicago, where she had been born, to St. Paul. She lived with her parents until 1937 when she went to California to work. She returned to St. Paul, but in 1938 joined William Collins in the operation of concession games at carnivals at various locations. William was born in Greece in 1905 and migrated with his family to Canada in 1914. He left them in 1926 to go to Minneapolis. He worked in various restaurants until the spring of 1927 when he began operating an amusement ride in a traveling carnival. In 1929 he first *140 operated his own gaming concessions at carnivals. He continued that occupation, except from 1931 until the spring of 1933 when he worked as a croupier in Reno, Nevada. William met Mildred in St. Paul late in 1937. She joined him on the carnival circuit in February 1938. They both operated concession stands before their marriage in Dayton, Washington, in June 1939. They continued to operate their concessions at various carnivals through the 1942 season. After the marriage, Mildred assisted in the management of their business, took charge of the cash, made disbursements, and recorded the receipts and disbursements. She had no bookkeeping or accounting training. Petitioners filed their first joint Federal income tax return in 1942. Neither petitioner had ever filed a return before 1942. William worked in a California shipyard for a few months beginning in late 1942. In the spring of 1943 petitioners organized their own carnival under the name "Wm. T. Collins Shows" and began acquiring equipment. They operated their seasonal business mainly during the summer months. It necessitated extensive traveling. They purchased two used amusement rides for a total of $2,200, for which they *141 gave promissory notes bearing 8 per cent interest. They also purchased a used truck. William borrowed $600 in April 1943, which he repaid before the end of that year. They cashed in most of their War Bonds in 1943. Petitioners secured the right to operate rides, shows and concessions from each carnival sponsor for a small fixed guarantee plus a percentage of the receipts. The sponsors were Midwestern fairs or municipal celebrations. Petitioners received income from their own amusement rides, from independently owned amusement rides operating as part of their carnival, and from subleases of concession space to independent concessionaires. Petitioners retained the gross receipts from their own amusement rides less Federal and state amusement taxes and the sponsor's percentage. From the independently owned rides they received an agreed percentage of the gross receipts, from which they paid the amusement taxes and the sponsor's share. The independent concessionaires paid an agreed flat rental. When they returned to St. Paul after the 1943 carnival season, petitioners paid the notes due for the equipment and the $600 loan. They purchased two used trucks for $675. Their 1943 income *142 tax return showed no tax due. William borrowed $1,500 in the spring of 1944. Petitioners purchased other rides on time payment plans, the unpaid balances bearing interest. They also purchased trucks, trailers, a motor, a transformer, and a canvas merry-go-round top. After the 1944 season, petitioners repaid the $1,500 loan. They also paid installments on the equipment purchased earlier in the year. In 1945 they paid the balances, totaling $5,400, due on the equipment. William borrowed $2,500 from a bank in the spring of 1945 which he repaid that same year. Petitioners rented a safe-deposit box in the fall of 1945. Petitioners prepared duplicate daily summaries showing the receipts from their own and independently owned rides. These summaries showed the name of the amusement, number of tickets sold, price per ticket, gross receipts, state tax, Federal tax, sponsor's share, and retained proceeds. They retained one copy and gave the other to the sponsor whose share was computed on the basis of the summary. Petitioners made disbursements by both check and cash. They retained all canceled checks and receipts. Mildred maintained a record in which she segregated disbursements weekly *143 by expense categories. Expenses deducted on the returns coincided with the disbursement record and with the canceled checks and receipts. Petitioners kept no record of the independent ride operators who had worked with them, nor of the percentage arrangement between them. These independent operators joined petitioners for irregular periods of time. Petitioners kept no record of the concessionaires who had worked with them or lease contracts between them. Petitioners maintained no permanent contemporaneous record of income from these subleases. They never recorded separately the rental from any one concession. Petitioners conducted their business on a cash basis. They maintained no business bank account in which they deposited receipts and from which they made disbursements. Their records contained no cash control or running cash balance. Petitioners did not furnish the names of any independent ride operators or concessionaires to the examining agents. The agents asked to examine the contents of William's safe-deposit box. He agreed to take them, but entered the vault alone before the appointed time. When confronted by an agent, William said he intended to remove currency *144 to pay some bills. He told the agent that the contents belonged to Mildred, who identified the money as earnings from prostitution in California between 1935 and 1937. The safe-deposit box contained about $19,000 in currency on October 16, 1951. When questioned, William told the agent of only one bank account. His counsel later informed the agent of a second. A third, labeled "Inactive" by the bank, carried a balance of $100.05 from 1948 through 1951. The agent informed petitioners during 1951 that their large investment in equipment was inconsistent with the small amounts of reported income. Petitioners omitted a "Kiddie Sky Fighter" purchased on December 29, 1950 for $5,175 from the depreciation schedules in their 1951 tax returns. They omitted a "Kiddie Boat Ride" and water tank purchased on June 8, 1951 for $2,176.40 from the depreciation schedule in the 1951 return. They omitted a "Dipper" and a miniature train purchased in 1951 for $2,000 and $800, respectively, from the 1951 depreciation schedule, and failed to report the gain on the sale of these assets later in the same year. In a Selective Service questionnaire William stated under oath, in April 1941, that his average *145 weekly earnings were $35, that his income for the prior 12 months had been about $1,500, and that his wife was dependent on his earnings for her support. The net worth computation prepared by the agent showed the following: 12-31-43
12-31-44
12-31-45
12-31-46
12-31-47
ASSETS
Current Assets
Cash on hand
$ 110.88
$ 1,762.28
$ 6,581.05
$11,071.85
$ 22,019.62
Cash in banks
5.28
2,639.64
6,961.96
4,697.23
13,564.68
Series E bonds
168.75
18.75
18.75
18.75
18.75
Fixed Assets
Carnival equipment
8,785.00
27,086.00
42,181.00
74,510.02
92,828.18
Other
Total Assets
$9,069.91
$31,506.67
$55,742.76
$90,297.85
$128,431.23
LIABILITIES AND
RESERVES
Current Liabilities
$ 5,400.00
Fixed Liability
Reserve for
$2,613.05
$ 5,897.51
$14,171.21
$24,126.89
$ 35,138.07
depreciation
Total Liabilities and
$2,613.05
$11,297.51
$14,171.21
$24,126.89
$ 35,138.07
reserve
Net worth end of year
$6,456.86
$20,209.16
$41,571.55
$66,170.96
$ 93,293.16
Net worth beginning
6,456.86
20,209.16
41,571.55
66,170.96
of year
Increase in net worth
$13,752.30
$21,362.39
$24,599.41
$ 27,122.20
Plus: Income taxes
357.50
3,271.33
4,227.84
90.00
paid
Nondeductible
3,000.00
3,000.00
3,000.00
3,000.00
personal expenses
Total
$17,109.80
$27,633.72
$31,827.25
$ 30,212.20
Less: Nontaxable
400.00
212.66
funds
Corrected adjusted
$17,109.80
$27,633.72
$31,427.25
$ 29,999.54
gross income
Adjusted gross on
5,699.96
18,504.33
1,625.62
9,420.42
original return
Unreported income
$11,409.84
$ 9,129.39
$29,801.63
$ 20,579.12
*146 12-31-48
12-31-49
12-31-50
12-31-51
ASSETS
Current Assets
Cash on hand
$ 12,539.75
$ 10,638.30
$ 21,292.26
$ 15,839.45
Cash in banks
7,027.70
3,697.55
6,647.62
2,926.81
Series E bonds
18.75
18.75
18.75
18.75
Fixed Assets
Carnival equipment
124,235.48
129,750.78
137,235.39
148,500.54
Other
8,417.05
14,500.00
42,398.53
Total Assets
$143,821.68
$152,522.43
$179,694.02
$209,684.08
LIABILITIES AND
RESERVES
Current Liabilities
$ 4,425.00
$ 1,853.39
Fixed Liability
7,959.58
Reserve for
$ 50,986.38
$ 67,961.40
$ 83,570.65
$ 99,702.02
depreciation
Total Liabilities and
$ 50,986.38
$ 67,961.40
$ 87,995.65
$109,514.99
reserve
Net worth end of year
$ 92,835.30
$ 84,561.03
$ 91,698.37
$100,169.09
Net worth beginning
93,293.16
92,835.30
84,561.03
91,698.37
of year
Increase in net worth
($ 457.86)
($ 8,274.27)
$ 7,137.34
$ 8,470.72
Plus: Income taxes
2,272.90
3,669.82
5.00
5.00
paid
Nondeductible
3,000.00
3,000.00
4,500.00
3,687.53
personal expenses
Total
$ 4,815.04
($ 1,604.45)
$ 11,642.34
$ 12,163.25
Less: Nontaxable
363.99
1,416.67
448.34
funds
Corrected adjusted
$ 4,451.05
($ 3,021.12)
$ 11,642.34
$ 11,714.91
gross income
Adjusted gross on
5,533.83
( 28,709.29)
( 17,307.26)
4,291.12
original return
Unreported income
($ 1,082.78)
$ 25,688.17
$ 28,949.60
$ 7,423.79
*147 The parties stipulated that all items in the computation were correct except for cash on hand and that, they agreed, was at least the amount shown. In October 1951, petitioners received $3,500 in cash from the sale of a "Dipper" and a miniature train. Petitioners paid convention expenses of $1,119.70 from the sale proceeds, and held the remainder as cash on hand at the end of the year. The notices of deficiency for 1944 through 1948 were mailed more than 3 years after filing of the returns for those years. Petitioners understated their income for 1950 and 1951 as determined by respondent, except that the understatement for 1951 was $2,380.30 greater than originally determined by respondent. No part of these deficiencies was due to fraud with intent to evade tax. The statute of limitations bars the deficiencies for 1944 through 1948. Petitioners without reasonable cause failed to file declarations of estimated tax for 1950 and 1951. Petitioners substantially underestimated their estimated tax in 1950 and 1951. Opinion Fraud must be shown by "clear and convincing evidence." ; . The *148 burden of going forward with the evidence cannot otherwise be shifted to petitioners. , certiorari denied . Aside from the conclusions to be drawn from the net worth statement prepared by respondent's agent, the suggestions of fraud fall almost entirely in the area of petitioners' dealings with the agents. These consist of such matters as failing to furnish the names of concessionaires and independent "ride" operators, giving incomplete information as to bank accounts, and attempting to conceal a considerable amount of cash in a safe-deposit box. Petitioners' records proved to have been in some respects inadequate but there is no evidence that these infirmities were called to petitioners' attention. Only as to the last taxable year, 1951, is there even insignificant substantial objective indications of affirmative efforts to understate income. The net worth statement, which indicates that petitioners' income was understated for 7 of the 8 years involved, does not carry conviction. Notwithstanding that petitioners concede the correctness of all items except cash on hand, contending that they had *149 accumulated some $42,000, the superficial results are too inconsistent for us to be willing to regard the net worth statement as a true reflection of petitioners' taxable income. For example, in the year 1948, in which respondent now qualifiedly concedes there was no deficiency, [1] the net worth statement actually indicates that they overstated their income by over $1,000. In the following year, although respondent contends that they reported a much greater loss than they actually had, the fact is that he has found no deficiency. And for 1950, while the net worth statement does indicate an adjusted gross income of $11,642, the conclusion of an unreported income of almost $29,000 is derived from the fact that petitioners reported a loss for that year of approximately $17,000. Reference has now been made to all the years which are not barred by the statute of limitations. As to the barred years, the net worth statement would lead to the conclusion the petitioners' income was much greater with smaller equipment investments *150 than in the last 4 years. Specifically, according to the net worth statement, in 1946 on a net worth of $66,000 petitioners had an income of over $31,000, whereas in 1951, the last year in issue, on a net worth of $91,000 they had an income of only $11,700. Returning to the year 1951, the last year in controversy, when the actions of petitioners indicate affirmative omissions of assets and income, the evidence is such that this could readily have been caused by the fact that respondent's agents were making an intensive investigation of their affairs, and the hypothesis of fraud is not so reasonably required that we can conclude as to this year that the evidence is clear and convincing. We are accordingly unable to sustain respondent's determination that any part of the deficiencies was due to fraud or that the returns for the first 4 years were filed with intent to evade tax. As to the deficiencies for the open years, however, which are now limited to 1950 and 1951, a different conclusion is required. Respondent was entitled to resort to the net worth method notwithstanding that accounts of some sort were maintained by petitioners. , affd. *151 (C.A. 4) , certiorari denied ; We are unable to say that his determination of deficiencies for the 2 years in question was without foundation, unreasonable or arbitrary. Cf. , reversing ; . Nor are we satisfied from petitioners' contradictory and incomplete evidence that they have sustained their burden of demonstrating that the determinations were erroneous. The so-called "cash accumulation" could have accounted for increases in net worth before 1948. Petitioners have not convinced us otherwise. As to the deficiencies for the years 1950 and 1951, accordingly the determination is sustained. One item as to 1951 requires further comment. The parties agree that by the end of that year petitioners were in possession of $3,500 of additional cash, and that this was taxable income unless offset by expenses. Respondent has requested an increased deficiency as to that year to this full extent. Petitioners counter with the claim that they expended all of this money in connection *152 with a business trip to a Fair Association Convention in Chicago. But their income tax return, executed under oath, shows that these expenses amounted to only a little over $1,100. Although respondent has the burden of proving the facts as to this increased deficiency, it seems to us that petitioners' own income tax return demonstrates that respondent is correct except as to the deduction claimed in the return. To the extent, therefore, of the difference between the $3,500 and the deductible expenses, the deficiency should be increased over that originally determined. Petitioners have offered no evidence as to the "penalties" for failure to file declarations of estimated tax and for substantial underestimates, and we consider these issues to have been abandoned as to the years 1950 and 1951. Decisions will be entered under Rule 50. Footnotes
1. The concession is conditioned upon finding other years in his favor. But his own evidence shows there was no deficiency, which, of course, petitioners do not deny.↩